15-543
*United States v. Greenfield*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: January 25, 2016      Decided:  August 1, 2016)

Docket No. 15-543

---

UNITED STATES OF AMERICA, 26 U.S.C. SECTIONS 7402(b) and 7604(a):
ENFORCEMENT OF INTERNAL REVENUE SERVICE SUMMONS,[1]

*Plaintiff-Appellee*,

– v. –

STEVEN GREENFIELD,

*Defendant-Appellant*.

---

Before: CALABRESI, LYNCH, and LOHIER, *Circuit Judges*.

Defendant-Appellant Steven Greenfield was implicated in tax evasion after a leak of documents from a Liechtenstein financial institution revealed connections to previously undisclosed, offshore bank accounts. Years after the leak, the Internal Revenue Service issued a summons for an expansive set of Greenfield's financial and non-financial records, including those pertaining to the offshore accounts referenced in the leak. Greenfield refused to comply with the summons, and the Government sought enforcement in the Southern District of New York (Hellerstein, *J*.). Greenfield opposed enforcement and moved to quash the summons, *inter alia*, on the basis that the compelled production of the documents would violate his Fifth Amendment right against self-incrimination. The District Court granted enforcement for a subset of the requested documents under the foregone-conclusion doctrine set out in *Fisher v. United States*, 425 U.S. 391 (1976). We conclude that the Government has failed to establish that it is a foregone conclusion that the requisite exercise, control, and authenticity of the documents existed as of time of the issuance of the summons. Accordingly, we VACATE the District Court's order enforcing the summons and denying Greenfield's motion to quash and REMAND for further proceedings consistent with this opinion.

---

[1] The Clerk of the Court is respectfully directed to amend the caption of this case.

1

ELIZABETH M. JOHNSON (Lawrence S. Goldman, *on the brief*), Law Offices of Elizabeth M. Johnson, New York, New York, *for Defendant-Appellant*

MICHAEL J. BYARS (Benjamin H. Torrance, *on the brief*) Assistant United States Attorneys, *for* Preet Bharara, *United States Attorney for the Southern District of New York*, New York, New York, *for Plaintiff-Appellee*

CALABRESI, *Circuit Judge*:

A remarkable amount of American wealth is held offshore, often in an effort to evade taxation. One recent study estimated that $1.2 trillion—some four percent of this nation's wealth—is held offshore and that this results in an annual loss in tax revenue of $35 billion. Gabriel Zucman, *The Hidden Wealth of Nations: The Scourge of Tax Havens* 53 (Teresa Lavender Fagan trans., 2015). Such lost income diminishes the Treasury and exacerbates problems of inequality since, generally, only the wealthiest of individuals can take advantage of foreign tax havens. *Id.* Recognizing this, recent measures, such as the Foreign Account Tax Compliance Act, 26 U.S.C. §§ 1471-1474, have sought to strengthen the IRS's efforts to combat tax evasion through the use of foreign shelters. But enforcement presents significant challenges given the sophistication of tax planning and the information asymmetry between taxpayers and tax authorities.

The need to curtail tax evasion, however pressing, nevertheless cannot warrant the erosion of protections that the Constitution gives to all individuals, including those suspected of hiding assets offshore. In the present case, Steven Greenfield was implicated in tax evasion as a result of a document leak from a Liechtenstein financial institution. Years later, the Government issued a summons for a broad swath of Greenfield's records, including documents relating to all

of Greenfield's financial accounts and documents pertaining to the ownership and management of offshore entities controlled by Greenfield.

Greenfield opposed production and moved to quash the summons based on his Fifth Amendment right against self-incrimination. But the District Court for the Southern District of New York (Hellerstein, *J.*) granted enforcement as to subset of the records demanded by the summons. It concluded that the existence, control and authenticity of that subset of documents were a foregone conclusion and, as a result, under *Fisher v. United States*, 425 U.S. 391 (1976), any Fifth Amendment challenge must fail.

We disagree with the District Court for two reasons. First, we find that, for all but a small subset of the documents covered by the District Court's order, the Government has not demonstrated that it is a foregone conclusion that the documents existed, were in Greenfield's control, and were authentic even in 2001. Second, we find that the Government has failed to present any evidence that it was a foregone conclusion that any of the documents subject to the summons remained in Greenfield's control through 2013, when the summons was issued. Accordingly, because the Government has not made the showing that is necessary to render Greenfield's production of the documents non-testimonial and, hence, exempt from Fifth Amendment challenge, we vacate the District Court's order and remand.

## BACKGROUND

This case stems from a "global tax scandal" that came to light in February 2008 after an employee of Liechtenstein Global Trust ("LGT"), a private financial institution owned by the royal family of Liechtenstein, leaked thousands of documents from accounts held at LGT. S. Hrg. No. 110-614, at 2 (2008). Many of the individuals involved in the accounts had never

3

disclosed the existence of these accounts (or the assets there held) to their domestic tax authorities. The actions of the employee, Heinrich Kieber, set off a wave of enforcement actions across Europe, and Kieber went into hiding after being charged with theft of information under Liechtenstein law.

The effects of Kieber's disclosure were felt in the United States as well. The Permanent Subcommittee on Investigations of the United States Senate ("PSI") began hearings in July 2008 in response to the LGT disclosure and a similar leak from UBS, a Swiss bank. In connection with these hearings, Kieber released more than 12,000 pages of documents from LGT's files to the PSI. Because Kieber's current location and name were unknown to the PSI, Kieber himself did not appear at the hearings, but he did give a recorded interview with PSI counsel for the proceedings.

Defendant-Appellant Steven Greenfield ("Greenfield") was one of the individuals implicated by Kieber's disclosure of LGT documents. Greenfield owns Commonwealth Toy Company, Inc. ("Commonwealth"), a retail marketing and licensing company that operates worldwide. Commonwealth was founded by Greenfield's father, Harvey Greenfield ("Harvey"), who ran Commonwealth as CEO until his death in 2009. The leak suggested that the Greenfields were involved with certain offshore entities that had been used, or were being used, to evade taxation. Indeed, the PSI twice asked Greenfield to appear before them to address the disclosure; Greenfield failed to appear at the first hearing and, at the second, appeared but asserted his Fifth Amendment right to remain silent.

Only a few of the documents disclosed by Kieber addressed the Greenfields' connections to offshore banking directly. These included:

4

1. A March 27, 2001 memorandum from LGT personnel that detailed a meeting in Liechtenstein between the Greenfields and LGT employees (the "LGT Memo");

2. An end-of-2001 account statement issued on January 1, 2002 for the Maverick Foundation ("Maverick"), a Liechtenstein *stiftung* (foundation) formed at LGT in January 1992;

3. LGT account information forms for Maverick and two entities apparently owned by Maverick, TSF Company Limited ("TSF") and Chiu Fu (Far East) Limited ("Chiu Fu"), both British Virgin Islands entities; and

4. End-of-2001 LGT profiles for Maverick and TSF, (collectively, the "LGT Documents").

The LGT Memo is the most significant piece of evidence documenting the Greenfields' offshore banking.[2] The LGT Memo describes a March 23, 2001 meeting between Greenfield, his father Harvey, LGT employees, and Prince Philip of Liechtenstein, concerning the Greenfields' holdings at LGT. According to the LGT Memo, Maverick was established in January 1992 and, as of the meeting, held $2.2 million in cash as well as all the stock of TSF and Chiu Fu, which had been originally formed to channel assets into Maverick. In the LGT Memo Harvey is described as the "sole beneficiary of the Maverick Foundation"; Greenfield and his sisters are described as "secondary beneficiaries," with Greenfield also holding a "power of attorney to give

---

[2] All of the LGT Documents are written in German. For all but a few, a translation to English is provided as part of the PSI record and, for the LGT Memo, Greenfield provided a competing translation. The appropriate treatment of the LGT Memo's competing translations is discussed in notes 3 and 10 *infra*, but the quoted language reflects the PSI translation except as otherwise noted.

instructions" over Maverick. App. 145.[3] It also states that each of the Greenfields held U.S. passports and lived, part time, in New York City.

The LGT Memo provides the following context for the purpose of the meeting. The Memo states that Harvey had a trust with the Bank of Bermuda in Hong Kong (the "Trust"), with assets of about $30 million in cash as well as the stock of a number of operating companies. The "beneficiary rules for the Trust . . . [were] likely stored similarly" to those of Maverick. *Id.* Also, according to the LGT Memo, the Bank of Bermuda had "indicated to the client that it would like to end the business relationship with him as a U.S. citizen," and that the client was "now on the search for a safe haven for his offshore assets." *Id.* After that, the group discussed the advantages of banking in Liechtenstein as well as the current structure and asset status of Maverick. The LGT Memo further states that its author proposed meeting Greenfield in Hong Kong at the end of April 2001 to discuss the next steps, that is, whether and how the Trust's assets would be taken over by Maverick. It then concluded:

> The clients are very careful and eager to dissolve the Trust with the Bank of Bermuda leaving behind as few traces as possible. The clients received indications from other institutions as well that U.S. citizens are not those clients that one wishes for in offshore business.

App. 146.

The remainder of the LGT Documents largely reflects the information in the LGT Memo. The Maverick account statement, dated as of December 31, 2001, states that it had about $2.2 million under management. The undated account information form also states that Greenfield is "the holder of the power of attorney to give instructions," and notes that LGT held expired passport copies for Greenfield and Harvey, but not Greenfield's sisters. App. 149. The forms for

---

[3] Greenfield argues that the proper translation of Greenfield's role is "person authorized to give instructions on behalf of Maverick Foundation." App. 227.

6

TSF and Chiu Fu state that they are wholly owned subsidiaries of Maverick and, after noting that these entities held no assets, the documents question their function and propose closing the bank accounts held by the TSF and Chiu Fu at Standard Chartered and HSBC.

Greenfield never reported income from or ownership of Maverick, Chiu Fu, TSF, or the Trust. The Internal Revenue Service (the "IRS") subsequently selected Greenfield's 2005 income tax return for civil audit and, on May 17, 2013, issued an Information Document Request for a number of documents in connection with the audit. The IRS issued a summons on June 17, 2013 (the "Summons") that required Greenfield to appear on July 26, 2013 to produce the below-listed materials for examination. On July 25, 2013, the IRS notified Greenfield that it had expanded the examination to the 2006 tax year.[4]

The Summons called for Greenfield to produce the following documents:

1.  Requests 1 through 5 (the "Bank Records Requests") sought documents relating to both domestic and foreign bank accounts, including "every account over which Steven Greenfield had signature authority . . . and/or over which Steven Greenfield exercised control during the years 2001 through 2011." These Bank Records Requests required Greenfield to produce "all documents" in his possession for each bank account, including those at LGT, HSBC, Standard Chartered Bank and the Bank of Bermuda. App. 16-17.

2.  Requests 6 through 8 (the "Other Accounts Requests") sought production similar to the Bank Records Requests, but for brokerage accounts, mutual funds, and security accounts held by Greenfield. App. 18.

---

[4] On September 29, 2014, the IRS expanded its examination through the 2011 tax year.

3. Requests 9 through 16 (the "LGT Requests") sought all documents relating to Greenfield's contacts with and appearance at LGT, Greenfield's bank accounts at LGT, and entities controlled by Greenfield. App. 19-20.

4. Requests 17 through 24 (the "Ownership Requests") sought documents relating to legal entities or structures that Greenfield owned or over which he exercised control, including Maverick, Chiu Fu, TSF, and the Trust's account at the Bank of Bermuda. App. 21-22.

5. Requests 25 through 29 (the "Professional Services Requests") sought documents relating to professional services provided to Greenfield from 2001 to 2011, including advice or services provided by any private banker, broker, or trust advisor. App. 23.

6. Requests 30 through 32 (the "Foreign Travel Requests") sought documents, such as passports, that relate to Greenfield's foreign travel during the years 2001 to 2011. App. 24.

7. Requests 33 through 35 (the "Other Income Requests") sought documents relating to Greenfield's non-taxable income. App. 25.

8. Request 36 (the "Loan Request") sought documents relating to any loans involving Greenfield. App. 26.

Greenfield, through counsel, objected to the breadth of the Summons. And the Government agreed to limit the Summons in part by requiring only the production of documents related to foreign entities and by limiting the Bank Records Requests and Other Accounts Requests to documents for the 2001 through 2006 tax years.

Despite these concessions, Greenfield continued to refuse to comply with the Summons. The Government then brought this enforcement action on October 17, 2014. Greenfield responded with a motion to quash, arguing, in relevant part, that the compelled production of the documents sought would violate his Fifth Amendment right against self-incrimination.

The Government countered that, under *Fisher v. United States*, 425 U.S. 391 (1976), the act of producing these documents did not violate the Fifth Amendment because it was a foregone conclusion that the documents existed, that Greenfield had control over the documents, and that the documents were authentic. The Government, however, did agree in its reply brief to limit the Summons further: to require only "the production of documents associated with the entities and accounts identified in the PSI Hearings Record . . . that are responsive to the Bank Records Requests, Other Accounts Requests, LGT Requests, Ownership Requests, and Professional Services Requests," as well as Greenfield's expired passport and "additional documentation of [his] international travel for trips already reflected in his passport or in the LGT Documents." App. 198.

On January 20, 2015, after oral argument, the District Court (Hellerstein, *J.*) granted enforcement of the Summons with respect to the documents identified in the Government's reply brief. The District Court subsequently issued an order on February 11, 2015 granting the Government's motion for enforcement and denying Greenfield's motion to quash. The District Court relied in part on *United States v. Gendreau*, No. 12 Misc. 303, 2014 WL 464754 (S.D.N.Y. Jan. 22, 2014), in which another district court had granted enforcement of a summons based on the LGT disclosure because "the Government had specific knowledge of the accounts and the individual who controlled the accounts." App. 254.

The Court ordered Greenfield to

9

produce the following documents in his possession, custody, or control: documents associated with the accounts of Maverick, Chiu Fu, TSF, Standard Chartered, HSBC, and Bank of Bermuda, that are responsive to the [Bank Records[ ] Requests, Other Accounts Requests, LGT Requests, Ownership Requests, and Professional Services Requests], as well as a copy of his passport and any additional documentation for trips already reflected in his passport, as these documents fall within the foregone conclusion exception to the act of production privilege under the Fifth Amendment.

App. 255 (emphasis added).

This appeal followed.

**DISCUSSION**

We review *de novo* the District Court's determination of questions of law as to the Fifth Amendment privilege. *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988). But we will overturn the District Court's determination as to whether "the act of producing the documents would involve testimonial self-incrimination" only where such a finding "has no support in the record." *United States v. Doe*, 465 U.S. 605, 613-14 (1984).

**A.**

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. 5. "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189 (2004). The Supreme Court has recognized that the privilege "has consistently been accorded a liberal construction," *Miranda v. Arizona*, 384 U.S. 436, 461 (1966), and, in accordance with this principle, the Fifth Amendment privilege has been found to extend not only to answers that are directly incriminatory but also to those that, while not themselves inculpatory, "would furnish a

10

link in the chain of evidence needed to prosecute the claimant," *Ohio v. Reiner*, 532 U.S. 17, 20 (2001) (per curiam) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)).

*Fisher v. United States*, 425 U.S. 391 (1976) provides the framework for applying the Fifth Amendment privilege to the production of documents in response to a summons. In *Fisher*, the government issued summonses for the records of two taxpayers; in each case, the records were created by the taxpayers' accountants but later transferred to and held by attorneys for tax preparation. 425 U.S. at 394-95. In concluding that enforcement of the summonses did not violate the Fifth Amendment, the Court distinguished between two potentially incriminating types of communication that were inherent in the production of the records.

On the one hand, the Court, departing from prior precedent that had suggested otherwise, *see Boyd v. United States*, 116 U.S. 616 (1886), held that the *contents* of the records did not implicate the Fifth Amendment. The Court so concluded because the documents had been voluntarily prepared prior to the issuance of the summonses by accountants and were therefore not the taxpayers' compelled testimony. *Fisher*, 425 U.S. at 409-10.

On the other hand, the Court recognized that the act of production itself could communicate incriminatory statements of fact. *Id.* at 410. Specifically, "[c]ompliance with the subpoena tacitly concede[d] the existence of the papers demanded and their possession or control by the taxpayer [as well as] the taxpayer's belief that the papers [were] those described in the subpoena." *Id.*[5]

While recognizing that the question of whether such communications are testimonial and incriminatory "may . . . depend on the facts and circumstances of particular cases or classes

_____

[5] We have subsequently made clear that "the test for the production of documents is control, not location." *Marc Rich & Co. v. United States*, 707 F.2d 663, 666-67 (2d Cir. 1983).

11

thereof," the Court concluded that, in the case before it, "[t]he existence and location of the papers [were] a foregone conclusion and the taxpayer add[ed] little or nothing to the sum total of the Government's information by conceding that he in fact ha[d] the papers." *Id.* at 411. Thus because these communicative elements—(1) the existence of the documents, (2) the taxpayer's possession or control of the documents and (3) the authenticity of the documents—were a foregone conclusion, compliance with the summons became a "question . . . not of testimony but of surrender." *Id.* (quoting *In re Harris*, 221 U.S. 274, 279 (1911)).

The Supreme Court most recently addressed the act-of-production doctrine in *United States v. Hubbell*, 530 U.S. 27 (2000). There, in a prosecution related to the Whitewater investigation, Hubbell, the defendant, was served with a subpoena requesting a vast array of documents, including all those "reflecting, referring, or relating to any direct or indirect sources of money or other things of value received by or provided to [Hubbell], his wife, or children" in the previous three years. *Hubbell*, 530 U.S. at 46. Prosecutors granted immunity to Hubbell as to the *act of production* but indicted him based on the *contents* of the 13,120 pages of documents he went on to produce. *Id*. at 31.

The Court held that Hubbell could not be prosecuted on the contents of the documents because, even if prosecutors made no use of act-of-production evidence at trial, the Government had already made "derivative use" of the documents in its investigation of Hubbell. *Id*. at 43. In other words, because it was "unquestionably necessary for [Hubbell] to make extensive use of 'the contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena," Hubbell effectively provided a "catalog of existing documents" that was a "link in the chain" of his prosecution. *Id*. at 42-43 (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)). In so concluding, the Court distinguished *Fisher*:

12

Whatever the scope of this "foregone conclusion" rationale, the facts of this case plainly fall outside of it. While in *Fisher* the Government already knew that the documents were in the attorneys' possession and could independently confirm their existence and authenticity through the accountants who created them, here the Government has not shown that it had any prior knowledge of either the existence or the whereabouts of the 13,120 pages of documents ultimately produced by respondent. The Government cannot cure this deficiency through the overbroad argument that a businessman such as respondent will always possess general business and tax records that fall within the broad categories described in this subpoena.

*Id.* at 44-45.

The question before us, therefore, is whether the instant case is more like *Fisher* or *Hubbell*.[6] That is, we must examine whether the LGT Documents independently establish the communicative elements inherent in Greenfield's production of the sought records or whether Greenfield's production of the documents is a necessary part of the chain of potentially incriminatory evidence. In doing this we recognize that both our court and our sister circuits have struggled with the extent of Government knowledge necessary for a foregone-conclusion rationale to apply. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87 (2d Cir. 1993); *United States v. Fox*, 721 F.2d 32 (2d Cir. 1983); *see also United States v. Bright*, 596 F.3d 683 (9th Cir. 2010); *United States v. Ponds*, 454 F.3d 313 (D.C. Cir. 2006); *United States v. Norwood*, 420 F.3d 888 (8th Cir. 2005).

---

[6] The documents sought in the instant case do not fall under the so-called "required records exception" to the act-of-production doctrine. That exception applies to a subset of documents that must be maintained by law. *See In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 399, 344 (2d Cir. 2013). For example, the Government can require an individual to produce documents related to foreign bank accounts maintained pursuant to the Bank Secrecy Act ("BSA") and its implementing regulations, *see* 31 C.F.R. § 1010.420, without violating an individual's right against self-incrimination under the Fifth Amendment, *see Feb. 2, 2012*, 741 F.3d at 342. The Summons in this case, however, seeks documents that fall outside the five-year period under the BSA during which an individual is required to maintain documents by law.

On the one hand, with respect to the requirement relating to existence and control, we, and other Circuits, have held that the Government must establish its knowledge only "with reasonable particularity." *Oct. 29*, 1 F.3d at 93.[7] Thus, the Government need not demonstrate perfect knowledge of each specific responsive document covered by the Summons. *See also In re Grand Jury Subpoena Dated Apr. 18, 2003*, 383 F.3d 905, 910 (9th Cir. 2004) (holding that Government is "not required to have actual knowledge of the existence and location of each and every responsive document" to satisfy reasonable-particularity standard).

On the other hand, the Government must <u>know</u>, and not merely <u>infer</u>, that the sought documents exist, that they are under the control of defendant, and that they are authentic. *Oct. 29*, 1 F.3d at 93 (requiring Government to establish "with reasonable particularity that it <u>knows</u> of the existence and location of subpoenaed documents" (emphasis added)); *Fox*, 721 F.2d at 36-38 ("[M]erely because the IRS obtained some information . . . does not mean that the government <u>now knows enough to eliminate any possibility</u> that Fox's production would constitute an incriminating testimonial act." (emphasis added)); *Hubbell*, 530 U.S. at 45 (rejecting application of foregone-conclusion doctrine where Government had not "shown that it had any prior knowledge of either the existence or the whereabouts" of documents).[8] As such, the "reasonable particularity" standard does not reduce the level of certainty with which the

---

[7] Although we have yet to apply the "reasonable particularity" standard after *Hubbell*, many other Circuits have done so, and we do so here. *See United States v. Sideman & Bancroft, LLP*, 704 F.3d 1197, 1202-03 (9th Cir. 2013); *Ponds*, 454 F.3d at 321.

[8] Other courts have reached similar conclusions. *See, e.g.*, *Ponds*, 454 F.3d at 326 (no foregone conclusion that an individual with a sister has documents pertaining to that sister); *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346-47 (11th Cir. 2012) (no foregone conclusion that encrypted hard drive contained child pornography); *Apr. 18*, 383 F.3d at 911 (foregone conclusion as to emails mentioned by witness, but no such conclusion as to other documents relating to sales or production of chips that were the subject of these emails).

14

Government must establish knowledge, but rather the extent to which that certainty relates to each document responsive to the summons.

Two of our cases well illustrate the application of these principles in practice with respect to the requirement of knowledge of the existence and control of documents. In *Jamil v. United States* (*In re Katz*), 623 F.2d 122, 123 (2d Cir. 1980), we considered a summons requiring Katz, a lawyer who was thought to have helped create a series of sham corporations, to testify and bring with him "all documents relating to any dealings or business with . . . any company owned, operated or controlled by [Katz's client, Jamil]." We denied enforcement, recognizing that, because "the Government obviously does not know the identity of these corporations or [Jamil's] relationship to them, the 'existence and location of the papers' is not a 'foregone conclusion,' and their production may well add much 'to the sum total of the Government's information.'" *Id.* at 126 (quoting *Fisher*, 425 U.S. at 411).

Similarly, in *Fox*, the Government sought enforcement of a summons against a doctor operating a sole proprietorship for (1) all records "pertaining to the operation of the sole proprietorship," (2) all banking records for Fox and his wife, and (3) all "evidence verifying contributions claimed as a deduction" on the Fox's joint tax return. 721 F.2d at 33-34. The Government relied on three sources of information to establish the existence and control (as well as, in this case, authenticity) of these documents: (1) Fox's prior-year tax returns, (2) an affidavit of a revenue agent averring to the average taxpayer's document-retention policies, and (3) a transcript of prior payments to Fox from a prior tax year. We found this information insufficient to establish the existence and control of the sought documents:

> [M]erely because the IRS obtained some information from the face of Fox's tax returns does not mean that the government now knows enough to eliminate any possibility that Fox's production would constitute an incriminating testimonial

act. For example, the IRS has no way of knowing from the face of Fox's return whether he has records to support all of his claimed business deductions; whether he possesses records that reflect unreported taxable income; or whether he possesses records that evidence possible crimes committed in the course of his sole proprietorship. Similarly, the mere fact that a tax return reveals on its face that a taxpayer had "at least one bank account" or "brokerage account" does not give the IRS any information about whether the taxpayer has records of other bank accounts showing income that was never reported in his return.

*Id.* at 37-38. In addition, in *Fox*, we specifically rejected the Government's reliance on the agent's affidavit because "the government's awareness of the practices of other taxpayers [had] nothing to do with . . . what the act of production would reveal to the IRS about [Fox]." *Id.* at 37.

Moreover, two other Circuits have specifically considered the application of this doctrine to an IRS summons for bank account documents.  In both cases, enforcement was granted only to the extent the summons called for customary account documents related to financial accounts that investigators knew existed. *See Norwood*, 420 F.3d at 891, 895-96 (construing district court as enforcing summons only to the extent of documents related to identified bank and charge-card accounts); *Bright*, 596 F.3d at 692-93 (granting enforcement for records connected to two known offshore accounts but not for records related to credit cards identified after the summons' issuance).

Additionally, and dealing specifically with the requirement of authenticity, we have recognized that "[i]mplicit authentication occurs when an individual who receives a summons demanding production of documents complies with the summons and thereby implicitly testifies that he owns or at least possesses the documents." *Fox*, 721 F.2d at 38. Here, the Government must establish not only that the documents "are in fact what they purport to be," but also that the taxpayer will not be forced "to use his discretion in selecting . . . the responsive documents, . . . thereby tacitly providing identifying information." *United States v. Sideman & Bancroft, LLP*,

16

704 F.3d 1197, 1203 (9th Cir. 2013) (internal quotation marks omitted). Authenticity can be independently established, for instance, a) through the testimony of third parties familiar with that type of document, *see Bright*, 596 F.3d at 693 (holding that bank officials can authenticate bank records), b) by comparison to a prior version of the document, *Oct. 29*, 1 F.3d at 93 (allowing authentication of calendar against prior copy), or c) by comparison to other related documents, *see United States v. Rue*, 819 F.2d 1488, 1494 (8th Cir. 1987) (compelling production of patient signature cards based on authentication against patient records).

**B.**

Greenfield contends both that (1) the Government has not established with reasonable particularity the existence, control, and authenticity of the sought documents as of the documents' creation beginning in 2001, and (2) assuming *arguendo* that the Government could demonstrate this as of 2001, it cannot point to <u>any</u> evidence that the documents remained in Greenfield's control through to 2013, when the Summons was issued.[9] For these reasons he argues that the compelled production of the sought documents would violate his Fifth Amendment right against self-incrimination.

As discussed more fully below, the critical issue in determining whether the act of producing the documents would violate Greenfield's right against self-incrimination is whether the Government can prove that it is a foregone conclusion that the documents existed, were in Greenfield's control, and could be authenticated by the Government independent of Greenfield's

[9] Greenfield argues that the District Court was barred from considering inadmissible evidence in making a foregone-conclusion inquiry and that, because the LGT Documents would not be admissible under Federal Rule of Evidence 803(6), the District Court had no evidentiary foundation for its determination. Because Greenfield raised this argument only in a footnote before the District Court, it is, however, forfeited. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011).

production of them when the subpoena was issued in 2013. It is, of course, relevant to that inquiry whether the Government can demonstrate that the documents <u>ever</u> existed. We therefore begin our inquiry by addressing whether the Government can establish the existence, control, and authenticity of each category of sought documents in 2001. We must then examine, with respect to those categories of documents for which the Government's evidence suffices as of 2001, whether there is sufficient evidence of their existence and Greenfield's control in 2013, when the Summons was issued.

The categories of documents we discuss are: a) the LGT bank records related to Maverick, b) the bank documents related to Maverick's subsidiaries, Chiu Fu and TSF, c) the Trust's account documents from the Bank of Bermuda, d) the non-bank documents responsive to the Summons, and e) Greenfield's expired passport and travel documentation.

## 1. As of 2001

**a)** The Government has a strong case for enforcement, at least as of 2001, for documents responsive to the <u>Bank Records Requests</u> and <u>Other Accounts Requests</u> that relate to Maverick's account at LGT (the "<u>Bank Documents</u>").

The Government knows that Maverick had an account at LGT that <u>existed</u> as of 2001; it also knows, based on the documents revealed in the LGT disclosure, that LGT issued documents, such as bank statements, in connection with the accounts. *See Bright*, 596 F.3d at 693 (foregone conclusion that account documents existed based on "information showing that [defendants] maintained accounts" at certain banks and that banks "provided their account holders with specific account documents"); *Norwood*, 420 F.3d at 895-96 (foregone conclusion that account documents existed based on government's knowledge that defendant had specific financial

18

accounts and that documents requested were "possessed by the owners of financial accounts as a matter of course"). Though the Government does not have specific knowledge of every document that is responsive to the Summons, such specific knowledge exceeds what is required under a "reasonable particularity" standard.

Moreover, it is a foregone conclusion that Greenfield <u>controlled</u> the Bank Documents as of 2001. Both the LGT Memo and another LGT summary document state that Greenfield held "a power of attorney to give instructions" over Maverick. App. 145.[10] While this designation does not explicitly state that Greenfield had the authority to receive Maverick account documents, the ability to receive such documents is an essential part of being able to instruct the entity. Greenfield contends that, because LGT failed to have Greenfield sign certain account documents after Harvey refused, the LGT Memo demonstrates that he in fact lacked signatory authority. But the LGT Memo in fact suggests the opposite for it states that LGT personnel intended to meet with Greenfield concerning the possible transfer of Trust assets to Maverick. Given this evidence, the District Court's determination as to control of these documents had support in the record. *See Doe*, 465 U.S. at 614.

---

[10] Greenfield contends that the District Court erred by making use of the PSI's translation of the LGT Memo instead of Greenfield's own, certified translation. But our conclusion would remain the same even if we accepted Greenfield's translation of this phrase as: "person authorized to give instructions on behalf of Maverick Foundation." App. 227. And since this is the only part of the Government's translation that Greenfield argues is significantly different than his, we conclude the difference between the two translations is immaterial.

In addition, Greenfield argues that the District Court erred in finding that Greenfield was "designated as his father's Power of Attorney for Maverick" because the LGT Memo provides for only a limited power to give instructions. Again, however, both a general power of attorney and the power to give instructions would suffice to provide Greenfield with control over documents stored at Maverick's account at LGT. As a result, any error in the District Court's finding that, in 2001, Greenfield had a general power of attorney rather than a more limited one would be immaterial.

19

The Government, however, has not shown that it is a foregone conclusion that it could authenticate the Bank Documents. The Government speculates that authentication could be done through "the testimony of a current or former bank employee, including . . . [Kieber], as well as through Letters of Request issued under the Hague Evidence Convention." Appellee Br. 45. But the Government has not proffered evidence that LGT would be willing to allow one of its employees to testify for the Government or that Kieber himself would be willing to testify given the uncertainty concerning his whereabouts. Nor has the Government demonstrated that it has successfully used the Hague Evidence Convention to authenticate documents from LGT (or another Liechtenstein financial institution) in the past.[11] It may be possible that authentication would be available in this manner. But, in light of the controversy surrounding the source of the documents, a conclusory statement that authentication is available by these means is not sufficient. *Cf. Bright*, 596 F.3d at 693 n.4 (suggesting that it was a foregone conclusion that Government could authenticate foreign records through "the American card servicing company").[12]

---

[11] The Hague Evidence Convention mandates a complicated process that is not always successful. Indeed, district courts must consider, in part, the "likelihood that resort to [Hague Convention] procedures will prove effective" in determining whether to apply those procedures or the Federal Rules of Civil Procedure to discovery involving a foreign national. *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 (1987). Moreover, the Government has elsewhere recognized the "impracticalities" of requesting documents from foreign banks through treaties, "emphasizing in particular the length of time generally associated with such requests, as well as the government's lack of information through the entire request process to the foreign government." *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 908 F. Supp. 2d 348, 357 (E.D.N.Y. 2012).

[12] The Government might be able to authenticate the Bank Documents by comparison to the thousands of pages of LGT's internal files already in the Government's possession. *See* Fed. R. Evid. 901(b)(4); *Rue*, 819 F.2d at 1494 (allowing authentication of patient cards based on information in patient files and a blank patient card); *Sideman*, 704 F.3d at 1204 ("[Defendant's] billing and payment records could be verified by comparing those records and [defendant's] bank records."). That method of authentication could be sufficient both for the contents of the

**b)** A similar analysis applies to the documents responsive to the <u>Bank Records Requests</u> and <u>Other Accounts Requests</u> that relate to TSF's account at Standard Chartered and Chiu Fu's account at HSBC (the "<u>Subsidiary Bank Documents</u>").

As with the Bank Documents, it is a foregone conclusion that TSF and Chiu Fu <u>existed</u> as of 2001. And, although the Government has not offered evidence of the sorts of documents issued by Standard Chartered and HSBC to account holders, these banks—large commercial financial institutions—naturally would have sent regular account statements and other disclosures to account holders. *See Norwood*, 420 F.3d at 895-96 (allowing production of documents "possessed by the owners of financial accounts as a matter of course" associated with specific identified accounts).

It is equally clear that Greenfield had <u>control</u> of the Subsidiary Bank Documents in 2001. The LGT Documents show that TSF and Chiu Fu were managed alongside Maverick in 2001. TSF and Chiu Fu were Maverick's wholly owned subsidiaries, and were formed "with the purpose of channeling the assets into the Maverick Foundation." App. 145. And though Greenfield argues, based on cases such as *Sicav v. Wang*, No. 12 Civ. 6682, 2014 WL 2624753, at *4 (S.D.N.Y. June 12, 2014), that a corporation should not be assumed to have control over a

---

sought documents—which would reflect the detail concerning LGT's relationship with Maverick as already set out in the LGT Documents—and for the appearance of the standard LGT account forms. *See United States v. Vayner*, 769 F.3d 125, 132 (2d Cir. 2014) (recognizing that "contents or 'distinctive characteristics' of a document can sometimes alone provide circumstantial evidence sufficient for authentication").

We do not decide whether such a method of authentication would be sufficient in this case because the Government did not make the argument, the District Court failed to make any factual findings as to whether it is a foregone conclusion that the sought documents could be authenticated in this manner, and, as detailed later in this opinion, the Government cannot establish that the existence and control of the sought documents were a foregone conclusion as of 2013 when it issued the Summons, even assuming *arguendo* that it could show it was a foregone conclusion that it could authenticate the Bank Documents through comparison.

subsidiary's documents, the identity between Maverick, on the one hand, and TSF and Chiu Fu, on the other hand, makes it inescapable that Greenfield had control over these entities as he did over Maverick. Indeed, LGT's account notes also show that LGT personnel—i.e., the bank members in charge of Maverick—maintained the subsidiary accounts, such as by keeping the checkbooks on file. And LGT's internal notes for Chiu Fu state that it had an "[a]gency agreement with Maverick," which would further suggest Maverick's control over it. App. 153.

The Government, however, has not shown that it can authenticate the Subsidiary Bank Documents. The Government suggests that authentication is available through the testimony of bank employees or through the Hague Evidence Convention, but again this line of argument ignores whether either of these methods is practicable. It may be that one or the other of these methods would in fact be available to authenticate documents received from Greenfield, but in an environment where many offshore financial institutions are found to be complicit in the tax evasion of their clientele, *see Offshore Compliance Initiative*, U.S. Dep't of Justice Tax Division, www.justice.gov/tax/offshore-compliance-initiative (last modified March 9, 2016), it cannot be a foregone conclusion that foreign financial institutions and jurisdictions will cooperate with authentication requests. As a result, we hold that, in such circumstances, the Government must provide more than speculation as to how authentication would occur.

**c)** Whether the Government can establish that the existence and control of documents responsive to the Bank Records Requests and Other Accounts Requests related to the Trust's account at the Bank of Bermuda (the "Trust Bank Documents") are a foregone conclusion is uncertain.[13] But even assuming that the Government has established that it knows that the Trust

---

[13] As written, the District Court's order might extend further to documents that relate to as-yet unidentified accounts that are either (1) held at one of the financial institutions implicated in the

22

Bank Documents existed and were in Greenfield's control in 2001, it cannot establish that the authenticity of these documents was a foregone conclusion. As with Chiu Fu and TSF, the Government offers no evidence that it will be able to secure the help of current or former bank employees to authenticate any Trust Bank Documents produced by Greenfield, or that resort to the Hague Evidence Convention is certain to be fruitful.[14] As such, even as of 2001, the authenticity of the Trust Bank Documents is not a foregone conclusion.

**d)** The existence, control, and authenticity of the remaining responsive documents are also not a foregone conclusion. These come in several sub-categories: (i) organizational documents for entities controlled by Greenfield, (ii) emails and other materials documenting communication between Greenfield and LGT, and (iii) documents relating to professional services (i.e., for tax and accounting advisors) for entities he controls.

**i)** Compelled production of the documents responsive to the Ownership Requests (the "Ownership Documents") is not justified by the foregone-conclusion exception. The Ownership Documents consist of organizational documents, such as bylaws or financial statements, for

---

Government's investigation (i.e., LGT, Standard Chartered, HSBC, or the Bank of Bermuda, or (2) owned by one of the identified entities (i.e., Maverick, Chiu Fu, or TSF). As to these as yet unidentified accounts, no "foregone conclusion" is available with respect to existence and control of documents. For, as we recognized in *Fox*, the "mere fact that . . . a taxpayer had 'at least one bank account' or 'brokerage account' does not give the IRS any information about whether the taxpayer has records of other bank accounts showing income that was never reported in his return." 721 F.2d at 38. As such, the fact that the Government was certain that Greenfield held one account at HSBC does not, for instance, provide the Government with any information about other accounts at HSBC. Nor does the fact that Chiu Fu had such an account at HBSC mean that Chiu Fu had accounts at other financial institutions.

[14] This problem is particularly acute for the Trust Bank Documents because the Bank of Bermuda was acquired by HSBC in 2004, almost a decade before the issuance of the Summons. App. 221.

entities owned or controlled by Greenfield.[15] While some of these items necessarily exist by virtue of the fact that the relevant entities exist (e.g., Maverick's bylaws), the Government has not offered evidence that they were kept at LGT (or were otherwise in the control of Greenfield). Nor has the Government shown how it would be able to authenticate these documents once received; indeed, the only individuals who could confirm the content of these entities' organizational documents are those who prepared them (Harvey and LGT personnel) or handled them (Greenfield). The Government's failure to prove that it could independently establish control and authenticity makes enforcement as to these documents inappropriate.

**ii)** Moreover, the Government has failed to offer any evidence to make the required showing as to documents responsive to the Professional Services requests (the "Professional Services Documents"). The Professional Services Documents, if they exist, relate to professional services (i.e., tax advisory services) provided to Greenfield in connection with his offshore entities. But the Government has failed to offer any evidence that Greenfield ever hired any tax or financial advisors (other than LGT) in connection with his financial planning.[16] Nor has the Government offered evidence that Greenfield (as opposed to his father, Harvey) would have retained any such documents. Finally, the Government offers no explanation for how documents such as these would be authenticated; it is dubious that the advisors implicated in these documents would agree to help authenticate them. As a result, enforcement of the Summons as to these is, once again, inappropriate.

---

[15] The Ownership Requests are actually much more expansive, calling for "all documents relating to" and "all books and records" for each entity controlled by Greenfield. App. 21.

[16] In passing, the Government notes that TSF and Chiu Fu had "[c]ontracts of engagement" and Chiu Fu had an "agency agreement" with Maverick. App. 149, 153. While these documents could have been produced by an outside advisor, they do not render it a foregone conclusion that any particular individual was employed.

24

**iii)** Finally, it is not a foregone conclusion that documents responsive to the LGT Requests (the "Communication Documents") exist. The Communication Documents mainly consist of records documenting Greenfield's communications with LGT personnel.[17] While the Government can demonstrate the control and authenticity of the Communication Documents in the same manner as for the Bank Documents, the Government has not demonstrated that there have been any communications between Greenfield and LGT personnel other than in the meeting evidenced in the LGT Memo. His only interaction with them, as far as we know, was in that meeting. As a result, it is not a foregone conclusion that there exist documents evidencing other Greenfield communications with LGT.

**e)** Finally, however, it <u>is</u> a foregone conclusion that Greenfield's passport and related travel documentation <u>existed</u>, were in his <u>control</u>, and were <u>authentic</u> as of 2001. Given Greenfield's international travel, he necessarily had a passport which was then in his physical possession as he traveled. And the United States Department of State can easily ensure that the passport is authentic. Moreover, to the extent Greenfield's passport describes travel during this period, it is a foregone conclusion that, as of the end of 2001, (1) he had documents in his control that pertained to the travel (*i.e.*, receipts) and (2) these documents could be authenticated by the third parties (*i.e.*, airlines) that had issued these documents.

\* \* \*

As such, <u>as of the end of 2001</u>, the existence, control, and authenticity of a small subset of the sought documents—at least Greenfield's passport and documents closely related to the

---

[17] The LGT Requests are, in fact, somewhat broader, and call for the production of many documents that have already been discussed. For simplicity, this discussion focuses on the documents relating to Greenfield's communications with LGT.

passport and, potentially, also the Bank Documents, were they to meet the authenticity requirement as discussed above—are a foregone conclusion. But that is not enough to negate Greenfield's Fifth Amendment argument as to these documents. For we must consider whether it is a foregone conclusion that these documents remained in Greenfield's control through the issuance of the Summons in 2013. Only if that retention is a foregone conclusion will the issuance of the Summons not violate Greenfield's Fifth Amendment privilege.

## 2. As of 2013

Assuming that the Government could show that the act of producing the sought documents in 2001 would not constitute testimonial self-incrimination, their compelled disclosure today could still violate Greenfield's right against self-incrimination. The act of producing documents in response to the Summons indicates that such documents remained in the control of Greenfield from 2001 to the date of the Summons. And this fact can be incriminatory of Greenfield. Thus, unless the Government can show that it can establish control from 2001 to 2013 in some other way, the Fifth Amendment bars enforcement of the Summons.

a) The Government advances two arguments as to why it does not need to show that the existence, control, and authenticity of the sought documents at the time of the issuance of the Summons are a foregone conclusion.

First, the Government points out that our case law does not explicitly require such a showing. But, while we have not specifically held as much, such a requirement follows directly from *Fisher*. The act of production necessarily communicates the existence, control and authenticity of the documents at the time of production. And, if that communication is incriminatory, the Fifth Amendment privilege applies.

26

Accordingly, other courts have found that the appropriate moment for the foregone-conclusion analysis is when the relevant summons was issued. *See Rue*, 819 F.2d at 1493 ("The relevant date on which existence and possession of the documents must be shown is the date on which the IRS summons is served, for it is at that time that the rights and obligations of the parties become fixed."); *cf. Apr. 18*, 383 F.3d at 911 ("It is the 'quantum of information possessed by the government before it issue[s] the relevant subpoena' that is central to the foregone conclusion inquiry." (alteration omitted) (quoting *United States v. Hubbell*, 167 F.3d 552, 569 (D.C. Cir. 1999), *aff'd*, 530 U.S. 27 (2000))). We agree and so hold.

Second, and more convincingly, the Government contends that once it has established the existence, control, and authenticity of documents as of the end of 2001, the incremental communication—that the documents have remained in the control of Greenfield to the present day—is not incriminatory.[18] As a result, the Government continues, Greenfield could refuse production of the documents in 2013 only under the non-possession doctrine, which allows a defendant to contest a summons in a civil-contempt proceeding based on the factual impossibility of defendant complying with the summons. *See United States v. Rylander*, 460 U.S. 752, 757 (1983). But this argument is based on an incorrect assumption—that, on the record in this case, it is not incriminatory of Greenfield for the documents to have continued to exist until 2013 and to have been in Greenfield's control since their creation.

---

[18] Greenfield argues that this argument is forfeited because the Government failed to raise it below. *See Mickalis Pawn Shop*, 645 F.3d at 137. We nonetheless consider it in the interest of judicial economy because, if we did not, the Government would still be able simply to file another summons and raise the argument in the subsequent proceeding.

Greenfield also contends that the Government's argument that Greenfield's possession of his expired passport and related travel documents cannot be incriminatory was forfeited. For similar reasons, we exercise our discretion to consider this argument as well.

27

In fact, instead, the documents' continued <u>existence</u> could be incriminatory in a number of ways.

**b)** Thus, even assuming that the Government could meet its burden as of 2001,[19] the existence of documents thought to be held at LGT—such as the Bank Documents—might indicate to the IRS that Maverick's account at LGT is still active, notwithstanding Harvey's death in 2009. This fact could open Greenfield for audit for tax years after 2011, or indicate that he played a more substantive role in the management of Maverick during the 2001-2006 period. Similarly, the continued existence of documents held in Greenfield's personal possession—such as the Professional Services Documents or related travel documents—might lead to inquiry into continuing tax evasion by Greenfield at other financial institutions. These revelations could easily constitute a "link in the chain" needed for future prosecution of Greenfield for tax fraud. *Hoffman*, 341 U.S. at 486.

The fact that Greenfield retained <u>control</u> over responsive documents could likewise be incriminatory. One of Greenfield's strongest defenses to a charge of tax evasion would be to argue that his father, Harvey, was the sole person with knowledge of how the family's finances were organized; Greenfield could then claim that he played no active role in the operation of the LGT accounts (despite his apparent authority to do so). If Greenfield were found to have taken physical possession of LGT-related documents following his father's death, this narrative would be obviously undercut.

Similarly, if Greenfield was able to cause the release of documents from LGT in connection with the Summons, Greenfield would appear to have had greater personal

---

[19] *See supra* text accompanying note 12.

responsibility for Maverick's actions during the 2005-2006 period of the audit and beyond. In both circumstances, Greenfield's continued control over responsive documents would implicate him in tax evasion.

That being said, in many circumstances, the Government's ability to establish existence and control as of an earlier date does permit an inference of existence and control as of the date of the Summons. It all depends on the time lapse and the nature of the documents sought. And, indeed, the Government's evidence establishing existence and control will *always* be somewhat stale, whether it be one day or one decade. As a result, we have allowed for such an inference of continued possession in some contexts. *See, e.g.*, *Maggio v. Zeitz*, 333 U.S. 56, 64-66 (1948) ("Of course, the fact that a man at one time had a given item of property is a circumstance to be weighed in determining whether he may properly be found to have it at a later date."); *Sigety v. Abrams*, 632 F.2d 969, 974-75 (2d Cir. 1980) (holding that, in context of civil contempt proceeding, a "common-sense inference that the documents are still in [contemnor's] possession" was appropriate given 129-day gap while contemnor was incarcerated and lack of "intervening circumstance[s]" to justify nonproduction); *United States v. Patterson*, 219 F.2d 659, 661-62 (2d Cir. 1955) (rejecting the same inference in criminal-contempt proceeding given the possibility of destruction while the defendant was incarcerated); *Rue*, 819 F.2d at 1493.

Thus, in *Rue*, the Eighth Circuit found it "appropriate" to infer defendant's continued possession of certain records over a nine-week period. 819 F.2d at 1493. In so concluding, the Circuit considered four factors: (1) "the nature of the documents," (2) "the nature of the business to which the documents pertained," (3) "the absence of any indication that the documents were transferred to someone else or were destroyed," and (4) "the relatively short time period . . .

between the date as of which possession was shown and the date of the ensuing IRS summons."

*Id.*

We find the Eighth Circuit's test persuasive and apply it here. But, after considering its factors, we conclude that the record does not permit an inference of continued control by Greenfield in the case before us.

The first two elements somewhat support a foregone-conclusion finding since bank documents are more likely to be retained long term as compared to documents like receipts or prosaic emails. *See Maggio*, 333 U.S. at 66. And banks do tend to maintain consumer records. [20]

The final two factors, however, preclude us from finding for the Government. There have been a number of significant intervening events that might well have resulted in the transfer or destruction of the sought documents. Thus, Greenfield has proffered evidence that TSF and Chiu Fu were dissolved in 2004. This not only indicates that no documents were created for these entities after 2004, but it also makes it less likely that already-existing documents were maintained by LGT, Standard Chartered, or HSBC. Harvey's death in 2009, moreover, is an intervening event that could have resulted in a change in the Greenfields' financial arrangements. And among the changes that occurred might well have been the elimination of documents.

---

[20] But, given that the Government has failed to offer any affirmative evidence of LGT's document-retention policy (as an internal matter or per Liechtenstein law), this statement about banks may have limited significance. In lieu of such evidence, the Government attempts to rely on a declaration filed in another enforcement action based on the LGT Documents, where an IRS agent averred to the following: "In my experience with a LGT-related examination of another taxpayer, the taxpayer was able to obtain documents as far back as 1980 from [LGT's trust subsidiary], even after [that subsidiary] was acquired by First Advisory Group in March 2009." Supplemental Declaration of Hiroaki Kobayashi, *United States v. Gendreau*, No. 12 Misc. 303 (S.D.N.Y. Jan. 8, 2013) (ECF No. 16) at ¶ 7. No such affidavit was, however, filed in the present case.

Greenfield challenges two findings of fact by the District Court that are relevant to this point: first, that Greenfield co-founded Maverick with Harvey, and second, that Greenfield was left "in sole control of Maverick, Chiu Fu, and TSF" following Harvey's death. App. 250-51. Neither of these findings has any support in the record. *See Doe*, 465 U.S. at 613-14. The District Court appears to borrow the latter conclusion from the affidavit of an IRS revenue agent submitted in connection with the enforcement action, which stated that after Harvey's death, Greenfield "now was apparently in full control of Maverick, Chiu Fu, and TSF," but the LGT Documents do not support such a finding given that the latest such document was produced at the beginning of 2002, seven years before Harvey's death.

In addition, between 2001 and 2013, there have been significant changes in the treatment of U.S. account holders abroad. For instance, legislation such as the Foreign Account Tax Compliance Act ("FATCA") imposed disclosure obligations on foreign financial institutions that deal with American citizens. *See* 26 U.S.C. §§ 1471-74.[21] And such scrutiny was likely felt intensely by the Greenfields, whose account at LGT had specifically been investigated by Congress. Given these forces, it is possible (if not likely) that Harvey would have reordered his financial affairs and destroyed many of the files that are sought by the Summons.

Finally, an extremely long period of time has passed between the date control was shown and issuance of the summons. The latest relevant LGT Document is dated January 1, 2002. As a result, the Government would have us infer Greenfield's continued control over sought documents for more than a decade, a period that is significantly longer than those in *Rue* (nine

---

[21] As Zucman notes, the administrative burden of complying with the FATCA may cause foreign financial institutions to "choose simply not to offer or to sharply limit accounts to Americans rather than deal with the FATCA requirements." Zucman, *supra* 2, at 63.

weeks), *Maggio* (twenty months), *Patterson* (four months), and *Sigety* (129 days). Any number of family disagreements or prosaic banking changes could have divested Greenfield of control over the relevant documents during this extended period.

**c)** We reach the same conclusion for Greenfield's passport and travel documentation. We reject the Government's argument that the Fifth Amendment privilege does not apply because there is nothing incriminating about the act of keeping an expired passport, so that the act of production adds no incriminating communication to what the Government can already establish as to Greenfield's possession of the passport in 2001. Compelled testimony need not be directly or inherently self-incriminating to be barred by the privilege. "Compelled testimony that communicates information that may 'lead to incriminating evidence' is privileged even if the information itself is not inculpatory," *Hubbell*, 530 U.S. at 38 (quoting *Doe v. United States*, 487 U.S. 201, 208 n.6 (1988)), and the privilege can be invoked where the information demanded by the government can furnish a link in a chain leading to inculpatory evidence that is otherwise outside the government's reach, so long as the defendant "has reasonable cause to apprehend danger," *Hoffman*, 341 U.S. at 486.

That is true here. If the Government cannot demonstrate that it is a foregone conclusion that the passport and related travel documents still existed and were in Greenfield's possession when the subpoena was served, its access to those documents, and to their potentially incriminating evidence, is facilitated by Greenfield's admission—through the act of production—that they still exist and that he has them.[22]

---

[22] The validity of this observation can be verified by unpacking the subpoena's communicative and performative components into two steps. If the Government already knew (say, from an informant) that Greenfield had the passport, and had probable cause to believe that it contained

Thus, to defeat the act-of-production privilege, the Government must establish that it was a foregone conclusion that the documents still existed, and were in Greenfield's control, in 2013. On the present record, it has not done so. Greenfield was certain to have a passport given his documented travel and his line of work. Moreover, individuals typically retain their passports while valid. But in the Government's best-case scenario, the passport that Greenfield used in 2001 expired in 2011—two years before the Summons issued in 2013. The likelihood of Greenfield retaining the passport for two years after it expired is small absent other information. Greenfield was also unlikely to retain for more than a decade documents related to his international travel in 2001. Thus, although the Government established that the existence of the passport and related travel documents was a foregone conclusion in 2001, it cannot benefit from an inference of continued existence of these materials through 2013 on this record.

* * *

For all these reasons, we conclude that as to those documents as to which a foregone conclusion might apply in 2001, no such foregone conclusion can be asserted in 2013, when the Summons issued. In holding this, we do not, however, mean to foreclose the possibility that the Government could develop a better record with respect to each of the relevant requirements in

---

valuable evidence of crime, it could obtain a search warrant to seize the passport (or, even without probable cause, it could serve a subpoena for its production), since the evidence in the document itself does not constitute compelled communication. Now suppose that, lacking such knowledge, it subpoenaed Greenfield to a grand jury to ask him directly, "Do you still have your expired 2001 passport?" Greenfield unquestionably could refuse to answer; the fact that there is nothing incriminating about answering that he retains his expired passports would not defeat the privilege, given that an affirmative answer could be a link in the chain leading to the Government's acquisition of the incriminating document. There is no distinction between incriminating information in the form of an explicit verbal answer to a question and the same information communicated implicitly by the act of production.

connection with the issuance of another summons in the future. Indeed, it is precisely because of this possibility that we have examined in such detail what is lacking in the present Summons.

**CONCLUSION**

The Government has failed to establish that it knows, as of the Summons' issuance, that the responsive documents exist, remain in Greenfield's control, and are authentic. Accordingly, we VACATE the order of the District Court enforcing the summons and denying Greenfield's motion to quash and REMAND for further proceedings consistent with this opinion.