21-1459-cr
*United States v. Cherry*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of January, two thousand twenty-four.

PRESENT:
> GUIDO CALABRESI,
> ALISON J. NATHAN,
> *Circuit Judges.*
> PAUL A. ENGELMAYER,
> *District Judge.*∗

_____

United States of America,

> *Appellee,*

> v.                                                                          No. 21-1459-cr

Latique Johnson, Ines Sanchez, AKA Meth, Donnell Murray, AKA Don P, Thomas Morton, AKA 10 Stacks, Saeed Kaid, AKA O-Dog, Eric Grayson, AKA

---

∗Judge Paul A. Engelmayer, of the United States District Court for the Southern District of New York, sitting by designation.

Gistol, Marques Cannon, AKA Paper Boy, Manuel Rosario, AKA Top Dolla, Michael Evans, AKA Puff, Terrell Pinkney, Patrick Daly, Brandon Green, AKA Light, AKA Moneywell,

*Defendants*,

David Cherry, AKA Showtime,

*Defendant-Appellant*.

_____

**FOR DEFENDANT-APPELLANT:**

DANIEL S. NOOTER, Washington, DC.

**FOR APPELLEE:**

ALLISON NICHOLS (Andrew K. Chan, Jessica Feinstein, Daniel C. Richenthal, on the briefs), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Gardephe, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

2

Defendant-Appellant David Cherry appeals from a June 9, 2021 judgment of the United States District Court for the Southern District of New York (Gardephe, *J.*) convicting him pursuant to a guilty plea of brandishing a firearm in furtherance of a narcotics conspiracy in violation of 18 U.S.C. § 924(c) and sentencing him to 120 months of imprisonment. Cherry argues that, during sentencing, the district court improperly allowed Ralph Turane, a potentially exculpatory witness, to assert his Fifth Amendment privilege against self-incrimination and refuse to testify at a *Fatico* hearing concerning Cherry's involvement in a gang-related shooting. The district court held that Turane had reason to fear that answering questions about the shooting could tend to implicate him in the event and expose him to future prosecution. We assume the parties' familiarity with the remaining underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision to affirm.

We review a sentencing court's factual findings for clear error, *United States v. Ortiz*, 136 F.3d 882, 883 (2d Cir. 1997), while reviewing questions of law with respect to the Fifth Amendment privilege *de novo*, *United States v. Greenfield*, 831 F.3d 106, 114 (2d Cir. 2016).

As relevant here, the Fifth Amendment's protection against self-

incrimination "not only extends to answers that would in themselves support a conviction under a criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a crime." *United States v. Stewart*, 907 F.3d 677, 684 (2d Cir. 2018) (cleaned up). For the privilege to apply, "it need only be evident . . . that a responsive answer . . . might be dangerous because injurious disclosure could result," a determination the district court should make "as much by his or her personal perception of the peculiarities of the case as by the facts actually in evidence." *Id.* (cleaned up). However, "the privilege's protection extends only to witnesses who have reasonable cause to apprehend danger from a direct answer." *Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (quotation marks omitted); *see United States v. Edgerton*, 734 F.2d 913, 921 (2d Cir. 1984) (noting that "[t]he potential for self-incrimination must be a 'real danger'") (quoting *Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 480 (1972)).

Turane invoked the privilege during a *Fatico* hearing the district court held to determine Cherry's involvement in a particular gang-related shooting, which it wished to take into consideration in sentencing Cherry. In brief, on or around the night of April 3, 2009, Thomas Morton and Cherry, both members of the Blood

4

Hound Brims gang, picked up both Saeed Kaid (also a member of the gang) and Turane in a car before driving out of New York City. They drove into Westchester County before stopping by the side of the road, where Kaid was told to get out of the car, was shot, and was left for dead. Before Cherry's sentencing, Turane provided an unsworn account of the events to a defense investigator, in which he stated that he got into the car thinking that it was going to a party and in which he minimized Cherry's role in the shooting. At Cherry's *Fatico* hearing, however, Turane invoked his Fifth Amendment privilege and refused to answer questions about the shooting. The district court later rejected Turane's account of the shooting given in the unsworn interview as unreliable and considered Cherry's key role in the shooting in its sentencing.

The district court held that testimony from Turane "about the circumstances of him being in the car present[ed] a significant risk of incrimination" sufficient to support the invocation of the Fifth Amendment privilege, and we agree. App'x 224. As the district court summarized, it may be that Turane was only in the car because he thought he was getting a ride to a party, but it may also be the case that there is a less innocent explanation for his presence in the vehicle. Either way— given that "truthful responses of an innocent witness, as well as those of a

5

wrongdoer" may lead to self-incrimination, *Reiner*, 532 U.S. at 21—Turane reasonably feared a real danger of future prosecution from testifying about his involvement in the events of that night.

Cherry argues that Turane could not have reasonably feared prosecution, because any charge from the events of April 3, 2009 would be barred by the applicable statute of limitations. As the district court explained, though, the shooting of Kaid was part of a swath of gang activity that the government had charged as a broad racketeering conspiracy. That conspiracy, if proven, would be presumed to exist until there is an affirmative showing that it was terminated and so the statute of limitations would "not begin to run until the objectives of the conspiracy have been either achieved or abandoned." *United States v. Eppolito*, 543 F.3d 25, 48–49 (2d Cir. 2008) (citation omitted). Cherry counters that Turane was not a member of his gang, but the government would not need to prove Turane's formal membership to charge him as a conspirator. It would only need to show that he "embraced the objective of the alleged conspiracy and agreed to commit predicate acts in furtherance thereof." *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) (cleaned up).

Notwithstanding the time that had elapsed since the shooting of Kaid,

6

Turane faced a real danger of self-incrimination if he were to testify at the *Fatico* hearing regarding his involvement in the shooting. The district court thus correctly held that Turane could rely on the Fifth Amendment privilege in refusing to testify about the shooting.

Cherry devotes most of his briefing on appeal not to challenging that conclusion but to arguing against reasoning the district court did not adopt. In explaining Turane's invocation of the Fifth Amendment privilege, his lawyer expressed Turane's main concern to the court during a sidebar exchange as follows: "We believe that the biggest problem is that the government has represented that they believe that the information in that transcript [of Turane's earlier, unsworn account] is contrary to what they believe the truth is." App'x 222–23. She also added, "I don't want to subject my client to a potential charge of perjury." *Id.* at 223. Based only on that remark, Cherry argues that the district court allowed Turane to assert the Fifth Amendment privilege out of a fear of being prosecuted for perjury if he were to testify. He further argues that the privilege does not protect witnesses whose only fear of future prosecution is for perjury from testifying, as other circuits have held. *See United States v. Allmon*, 594 F.3d 981, 986–87 (8th Cir. 2010); *United States v. Vavages*, 151 F.3d 1185, 1192

(9th Cir. 1998); *United States v. Whittington*, 783 F.2d 1210, 1218 (5th Cir. 1986).

The problem for Cherry is that this is simply not what the district court held. Rather, as explained above, the court perceived that Turane could face criminal exposure from his presence in the car with Kaid and at Kaid's shooting.

Cherry claims that the district court could only allow the assertion of the privilege on the grounds advanced by Turane's counsel, relying on *United States v. Bowe*, 698 F.2d 560 (2d Cir. 1983). But *Bowe* does not support this proposition. Rather, in *Bowe*, this Court simply held that it is the witness who must invoke the privilege. There, we remanded because the district court applied the privilege *sua sponte* after a witness expressed reluctance to testify without ever actually invoking the Fifth Amendment or stating that she feared future prosecution. *See id.* at 565–66. Cherry conflates the fact that the witness must claim the privilege with the idea that the witness must supply the exact rationale underpinning the court's acceptance of the claim. He cites no authority for the latter proposition, and it is undisputed that here Turane did assert his Fifth Amendment privilege.

Moreover, in context, it is not as clear as Cherry suggests that Turane's counsel expressed a concern only about a potential perjury charge. She advised the court of her concern that the government believed Turane's earlier account of

the Kaid shooting was not truthful. The obvious implication of that is that Turane's innocent explanation for why he was in the car might not be accurate (or at least not believed by the government) and that truthful testimony might paint a different picture of his potential involvement in Kaid's shooting. The court followed this implication in pinpointing the real Fifth Amendment concern in these circumstances.

In sum, the district court did not allow Turane to rely on the Fifth Amendment privilege solely to protect against potential perjury prosecution from the testimony Cherry wished to elicit from him. The court concluded that Turane could assert the privilege because there was a reasonable basis for him to fear that testifying about Kaid's shooting could implicate him in that shooting and, at a minimum, "furnish a link in the chain of evidence" needed to prosecute him for involvement in it. *Stewart*, 907 F.3d at 684 (citation omitted). We see no error in that conclusion.

\* \* \*

Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

9