## In re SEALED CASE.

## No. 89–5045.

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1989.

Decided June 6, 1989.

---

Before MIKVA, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge MIKVA.

STEPHEN F. WILLIAMS, Circuit Judge:

On October 6, 1988 the United States Attorney had appellant served with three grand jury subpoenas duces tecum, addressed to him as custodian of the corporate records of three different corporations. Appellant formally notified the U.S. Attorney that he would not comply with two of the subpoenas, asserting that producing those records would violate his Fifth Amendment privilege against self-incrimination. Upon application by the government, the district court ordered him to comply with the subpoenas and, when he refused, held him in contempt. *In re Two Grand Jury Subpoenas Duces Tecum Dated October 6, 1988*, Misc. No. 88–394 (D.D.C. Feb. 10, 1989) (compliance orders), (D.D.C. Mar. 2, 1989) (judgment and order of contempt).

Appellant recognizes that the Fifth Amendment privilege does not apply to records of a "collective entity." The exception started with the proposition that a corporation could not invoke the privilege to resist a demand for its records, *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), but extends to an agent of a corporation, even where the content of corporate records sought might expose him to individual criminal liability, *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) (subpoena directed to corporation); *Dreier v. United States*, 221 U.S. 394, 31 S.Ct. 550, 55 L.Ed. 784 (1911) (subpoena directed to corporate custodian). The doctrine also applies to non-corporate collective entities, including even a small partnership, see *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), and a labor union, see *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

Even for records of an individual, the privilege applies in only a limited fashion. It does not cover the *contents* of any voluntarily prepared records, including personal ones. *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). On the other hand, subject to the collective

entity doctrine, the "act of production" of incriminating evidence may be protected by the Fifth Amendment where that act would have independent testimonial significance, as by manifesting the holder's acknowledgement of the existence of the documents or his custody or control over them, or his belief that they fit the description in the subpoena. *Fisher v. United States,* 425 U.S. 391, 410–11, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39 (1976); *Doe,* 465 U.S. at 614 n. 13, 104 S.Ct. at 1243 n. 13; see also *Braswell v. United States,* — U.S. —, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) (finding act of production doctrine inapplicable to records of collective entity).

The first of the disputed subpoenas relates to records of an entity we will call Corporation A. As to it, appellant's primary contention is that, although he is president, chief executive officer and majority shareholder of the corporation, its designation of another employee as its official custodian of records means that appellant cannot be considered a custodian. Further, he claims that the records are personal rather than corporate. We reject both claims and so far as Corporation A is concerned uphold the district court's order to compel production and its later contempt citation.

The second of the disputed subpoenas relates to what we will call Entity B. In fact it appears to be little more than a name, and we find insufficient evidence in the record that it is a corporation—or indeed any other kind of collective entity. Accordingly, we reverse the district court's order and contempt citation so far as these records are concerned.

The grand jury which issued the subpoenas is investigating allegations of income tax evasion and conspiracy to defraud the government of taxes. The U.S. Attorney has advised both appellant and Corporation A that they are targets of the grand jury's investigation. Further references to the facts are necessarily somewhat vague. To protect the secrecy of the grand jury investigation, we must refrain from mentioning the individual or the entities named in the subpoenas. As the government summarized its evidence in a statement filed *ex parte* and reviewed *in camera* by both the district court and this court, even the appellant is unaware of what facts the grand jury has uncovered. See *In re Sealed Case,* 832 F.2d 1268, 1281 (D.C.Cir.1987) (approving such submissions when necessary to protect grand jury secrecy).

## I.

The first subpoena was directed to the appellant as "Custodian of Records" for Corporation A. It requested him to produce all bank records relating to a specified account in its name at a Maryland savings and loan association; in addition, he was ordered to testify before the grand jury, but only for the limited purpose of authentication.[1] The corporate employee who officially holds the position of custodian has testified that he was unable to find any evidence of the savings account. *Ex Parte* Appendix of the United States ("*Ex Parte* App.") 27.

Appellant does not deny that Corporation A is a collective entity. He asserts only that he is not custodian of the records for purposes of the collective entity exception and that the particular records sought are personal rather than corporate.

*Appellant Can Be Considered a Custodian of Any Records of Corporation A in His Possession or Control.*

■ Appellant's claim that he is relieved of the burdens of the collective entity doctrine by the corporation's designation of another, and not himself, as custodian, finds no support in the doctrine's principle or the relevant cases. The doctrine rests

---

1. Neither of the subpoenas states that the testimony requested will be so limited, but the government concedes that appellant could refuse on Fifth Amendment grounds to testify further. See Brief for the United States 26–28; *Braswell,* 108 S.Ct. at 2293 (person producing documents before grand jury in capacity of corporate custodian may be required to identify and authenticate records in so far as this merely makes explicit what is implicit in the production itself); *Curcio v. United States,* 354 U.S. 118, 127 n. 6 & 128, 77 S.Ct. 1145, 1151 n. 6 & 1511–12, 1 L.Ed.2d 1225 (1957) (further testimony could violate Fifth Amendment).

on the combination of the entity's having no collective privilege and the custodian's having voluntarily assumed a duty to hold the records "in a representative capacity ... on behalf of the group." *Bellis*, 417 U.S. at 89, 94 S.Ct. at 2183; see also *Wilson*, 221 U.S. at 380, 31 S.Ct. at 544 (custodian may have "voluntarily assumed a duty which overrides his claim of privilege"); *White*, 322 U.S. at 699, 64 S.Ct. at 1251 (official records and documents are held "in a representative rather than in a personal capacity"). Nothing in this theory suggests that the doctrine can apply only to one representative for a particular entity, or only to a representative officially designated as such by the entity.

Besides having no grounding in the doctrine's theory, any such formalistic requirement would undermine one of the policy values regularly invoked on its behalf— that of facilitating the enforcement of criminal laws against collective organizations and their employees. See, e.g., *Braswell*, 108 S.Ct. at 2294 & n. 9. Under appellant's theory, if a corporate officer wished to circumvent the doctrine, he could simply designate as official custodian a person ignorant of the critical records' existence and location.

In fact, the *Braswell* Court expressly rejected a related argument. By way of mitigating the effect that his proposed reading of the act of production doctrine might have on law enforcement, Braswell suggested that if production of the documents would tend to incriminate the subpoenaed agent, the corporation could be allowed to appoint an alternative agent. Under the proposed expedient, the government could not require the original agent to aid in the search for the records, as statements to the surrogate would themselves tend to incriminate. The Court held that the proposal would unduly hinder access to the corporate documents:

> [W]here the [originally named] corporate custodian is likely the only person with knowledge about the demanded documents[,] the appointment of a surrogate will simply not ensure that the doc-

uments sought will ever reach the grand jury room; the appointed custodian will essentially be sent on an unguided search.

*Braswell*, 108 S.Ct. at 2294. Appellant's proposal here would equally circumvent the collective entity rule. Accordingly, we interpret "custodian" to encompass any agent of the corporation who under ordinary principles of corporate law has custody or control over corporate documents.

Second, appellant contends that the phrase "foregone conclusion" defines the standard by which the government must prove his custodianship. As support, he cites our pre–*Braswell* decision *In re Sealed Case*, 832 F.2d 1268, 1280 (D.C.Cir. 1987). There, contrary to *Braswell*, we held that the act of production doctrine encompassed corporate agents. We went on to say that even if it did not, the "foregone conclusion" concept should govern resolution of factual disputes over custodianship.

The "foregone conclusion" language arose in *Fisher* and *Doe* as a component of the act of production doctrine. The Court said that where the existence and location of subpoenaed documents were a "foregone conclusion," it could compel production by the party controlling them, even though the party validly asserted a Fifth Amendment privilege. In such a case, the Court reasoned, the custodian's "communication" would add "little or nothing to the sum total of the Government's information." *Fisher*, 425 U.S. at 411, 96 S.Ct. at 1581; see also *Doe*, 465 U.S. at 614 n. 13, 104 S.Ct. at 1243 n. 13; Samuel A. Alito, Jr., *Documents and the Privilege Against Self–Incrimination*, U.Pitt.L.Rev. 27, 49–50 (1986) (reading "foregone conclusion" reference as relating to government's *independent* knowledge of records' existence and location); Comment, *The Rights of Criminal Defendants and the Subpoena Duces Tecum: The Aftermath of Fisher v. United States*, 95 Harv.L.Rev. 683, 686–87 (1982) (same). But once we disassociate the act of production doctrine from corpo-

rate records, as *Braswell* teaches,[2] it is not clear why any formula associated with that doctrine should bear upon or define the standard of proof on any relevant issue.

The government argues that one should resolve factual issues relating to custodianship in the same way that the Supreme Court has resolved the parallel issue of whether the subject of a subpoena has control over the records demanded. In *McPhaul v. United States,* 364 U.S. 372, 379, 81 S.Ct. 138, 142–43, 5 L.Ed.2d 136 (1960), the Court said that once the government had shown a "reasonable basis" for believing that the appellant had the ability to produce the records, the burden shifted to him to explain or justify his refusal. Similarly, in *United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983), the Court referred to *McPhaul* as placing on the subpoenaed party "the burden of production" for the defense that he lacks possession or control. See also *United States v. Lawn Builders of New England, Inc.,* 856 F.2d 388, 395 (1st Cir.1988). In view of appellant's undisputed role as president, chief executive officer and major shareholder of Corporation A, the government clearly has established a reasonable basis for believing him to have custody of corporate records; he has produced no evidence to the contrary, despite his opportunities to do so in the lower court. Although the appellant indicated in a responsive memorandum submitted to the district court that he could produce rebuttal evidence at an *ex parte* hearing, see Memorandum in Opposition to Government's Application for Orders Directing the Production of Documents Pursuant to Two Grand Jury Subpoenas Duces Tecum Dated October 6, 1988 1–2, 13, he never offered specific factual assertions, in affidavits or briefs, *ex parte* or public, that would tend to draw in question the normal inferences from his role in the corporation. Considering the record before us, we find appellant custodian of the records sought.

### The Records Named in the Subpoena are Corporate Documents.

Appellant also denies that the Maryland savings account is corporate in nature or under Corporation A's control. He notes that the government itself asserts that

> funds which should have found their way into [Corporation A's] corporate bank accounts have been diverted into a bank account *in [Corporation A's] name but not within its control.* Rather, during the time relevant to this investigation that account at [the] [s]avings & [l]oan had been under the control of, and the funds within it *had been used exclusively by, [appellant] for non-corporate matters.*

Government's Application for Orders Directing the Production of Documents Pursuant to Two Grand Jury Subpoenas Duces Tecum Dated October 6, 1988, 4 (version served on appellant) (emphasis added).

The quoted passage may suggest a lack of relationship between the corporation and the savings account that is belied by other government assertions. The account was maintained in the corporate name, and the savings and loan was given a copy of Corporation A's articles of incorporation, as well as its correct corporate income tax identification number. According to the government's Statement of Evidence, the funds deposited in the account were legitimately earned by Corporation A and were corporate property—until they were allegedly misappropriated by appellant. *Ex Parte* App. 25. Appellant's powers as a corporate officer enabled him to determine which corporate funds should be funneled to the account.

In determining what records are corporate for purposes of the collective entity doctrine, we may start by noting some conceivable limits that have been rejected. Although the collective entity exception was based in part on the state's power to inspect corporate documents, *Bellis,* 417 U.S. at 89, 94 S.Ct. at 2183, it is clear that the

---

**2.** We note that *Braswell* left open whether the act of production doctrine might apply to corporate records held by a custodian who was also the sole employee and officer of the organization. 108 S.Ct. at 2295 n. 11.

records covered are not merely those that the corporation is required by law to keep.[3] In *Wilson,* for example, the Court held that the doctrine encompassed letters written by the corporation's president in the course of its transactions, just as much as it would corporate ledgers and minute books. 221 U.S. at 377, 31 S.Ct. at 543.

*Wilson* also states that records do not cease to be corporate merely because they show the corporation to be the victim of the custodian rather than itself the perpetrator of offenses. In considering private corporations, the Court said that it was no defense for the custodian to say that the corporation was not the subject of the investigation or charged with any crimes. *Id.* at 385, 31 S.Ct. at 546. Perhaps more directly on point for our purposes, it explained that a public official who "embezzled the public moneys and falsified the public accounts" could not on that basis "seal" the relevant documents from prosecuting authorities under the name of the privilege against self-incrimination. *Id.* at 380, 31 S.Ct. at 544. Thus we may confidently reject the suggestion that a corporate officer may escape the doctrine merely by showing that he used the records to cheat the corporation.

As the collective entity rests upon an "agency rationale," see *Braswell,* 108 S.Ct. at 2291, it is natural to look to agency law for analogies to determine whether documents are those of the collective entity. But the issues with which agency law typically wrestles—the liability of the agent to the principal, and of the principal to third parties for acts of the agent—do not present precise models for this question. It is one thing to know that an agent will be liable to the principal for profits realized on unauthorized transactions, see Harold Reuschlein & William Gregory, *Agency and Partnership* 128–29 (1979), and that a principal has some right to use force to recover chattels entrusted to an agent, *id.* at 127, but this does not establish ipso

facto that any document created by an agent for purposes of his defalcations is on that account the principal's document. Nor can the doctrines determining whether a principal is bound in transactions with third parties be adopted wholesale. For instance, assuming appellant misrepresented the character of the account to the savings and loan association (but not to the government), the misrepresentations might well bind the corporation in a dispute between it and the association on the theory of apparent authority; but the logic of such a finding would not self-evidently carry over to the government's benefit here. The concepts of implied or incidental authority seem more analogous. For example, even if appellant did not have explicit corporate authorization to open an account in Corporation A's name and deposit corporate funds in it, as president and chief operating officer he surely had incidental authority to do so. See Reuschlein & Gregory at 37 ("conferral of authority to ... occupy a particular position must be taken as bestowing authority to do all the things normally incident to ... the occupancy of the particular status").

The question we confront is slightly different. Instead of determining whether appellant was authorized by a corporate principal to act as he did, we must decide whether an agency relationship exists between appellant and Corporation A with respect to the Maryland savings account. Without trying to generate any definitive test, we conclude that here the records are corporate for purposes of applying the collective entity doctrine. Only one specific factor suggests the opposite—the assertion that they were used by appellant to steal from the corporation; *Wilson* makes clear that that is insufficient. The government's conclusory statements quoted above, at least as used by appellant, beg the question. For example, the contention that the account was not within the corporation's "control" appears inextricable from the ul-

---

**3.** Maryland, the state with jurisdiction over Corporation A, provides that

[e]ach corporation shall keep correct and complete (1) Books and records of its accounts and transactions; and (2) Minutes of

the proceedings of its stockholders and board of directors....

Md.Corps. & Ass'ns Code Ann. § 2–111(a) (1985).

timate one now before us. (In so far as the assertion merely repeats the point of appellant's misuse, of course it adds nothing.)

Apart from appellant's alleged use of the account for larceny or for other illegal purposes, the records are corporate. The account is in the corporation's name, is run by the corporation's president and chief executive officer, and is funded with corporate property.[4] These facts afford a reasonable basis for concluding that any records relating to the savings account in appellant's custody are held on behalf of Corporation A; neither their contents nor their production by him is privileged.

## II.

█ Appellant received a second subpoena duces tecum from the grand jury directed to him as "Custodian of Records" of Entity B. The subpoena was quite extensive, directing appellant to produce the following:

1. Articles of incorporation and minutes of corporate meetings. 2. Correspondence to and from [Entity B]. 3. Contracts to which [Entity B] is a party. 4. Bank records for all accounts, e.g. statements, canceled checks, duplicate deposit tickets, debit and credit memoranda, confirmations of wire transfer, signature cards and account agreements/contracts. 5. Accounting records, e.g. ledgers, journals, workpapers. 6. Leases, [Entity B's] personnel records, telephone bills and toll records. 7. Tax returns and financial statements.

Subpoena to Testify Before Grand Jury, Oct. 6, 1988, App. 4. Appellant declined to comply with the subpoena on the same Fifth Amendment grounds that he cited with respect to Corporation A's documents. See Letter from Appellant's Counsel, Nov. 2, 1988, App. 7–9. Again, the government responded that the collective entity doctrine controlled.

Unlike the case of Corporation A, this issue depends upon whether Entity B actually is a "collective entity." By its very terms, the threshold requirement for the application of the collective entity rule is that the appellant is acting as an agent of a *collective* organization that engages in "organized, institutional activity." *White*, 322 U.S. at 701, 64 S.Ct. at 1252. As we noted above, the entity need not be a corporation; such collectives as a partnership or labor union suffice.

For classifying a non-corporate entity, the Court in *Bellis* offered the following guidance:

> [The collective entity] analysis presupposes the existence of an organization which is recognized as an independent entity apart from its individual members. The group must be relatively well organized and structured, and not merely a loose, informal association of individuals. It must maintain a distinct set of organizational records, and recognize rights in its members of control and access to them. And the records subpoenaed must in fact be organizational records held in a representative capacity.

417 U.S. at 92–93, 94 S.Ct. at 285–86. At least outside the corporation, which is perhaps necessarily a collective entity, see *id.* at 100, 94 S.Ct. at 2189, the language seems to require more than one person to whom (or among whom) obligations may run.

The Court in *Bellis* used these general rules to find the three-person partnership before it to be a collective entity. It relied on a variety of facts, including the existence of a bank account in the partnership's name, stationery with the firm's letterhead, specific examples of partners holding the firm out to third parties as an independent institution, the number of employees other than partners (six), the filing of separate partnership tax forms, and statutory provisions that treated a partnership as a distinct entity in other contexts. *Id.* at 96–97, 94 S.Ct. at 2187. Thus, the Court concluded that "the partnership here did have an established institutional identity independent of its individual partners." *Id.* at 95,

---

**4.** *Cf. United States v. MacKey*, 647 F.2d 898 (9th Cir.1981) (diary and calendar used by corporate executive to record meetings and transactions conducted as executive, as well as other events, held corporate for privilege purposes).

94 S.Ct. at 2187. It noted that the case required it to explore the "outer limits" of collective entity analysis. *Id.* at 94, 94 S.Ct. at 2186.

We can find in this record no reasonable basis for treating Entity B as a collective one. It appears to be nothing more than a name under which appellant shuffles funds. Although the bank account sought by the government was opened as a corporate account, with a designated president, vice-president and secretary, and with purported corporate bank resolutions filed, none of the persons named appears to have done more than lend an address or perform ministerial acts at appellant's direction. See Statement of Evidence, *Ex Parte* App. 4–10. There is no evidence that anyone executed articles of incorporation or other rudimentary constitutive documents, much less filed any such papers with any state. The word "Limited" appears at the end of Entity B's name, suggesting that it is a corporation, but nothing substantiates that except as the items mentioned above may do so. There seems to be no one within Entity B, other than appellant himself, to whom the sort of obligations contemplated by *Bellis* might run.

■ In view of the absence of any real collective entity, the government argues that Entity B should be treated as a collective organization because appellant has held it out as a corporation to third parties. The government does not claim the entity to be a *de facto* corporation—wisely, as the focus of that doctrine, in jurisdictions that apply it, is upon the existence of a good faith effort to incorporate. See 8 *Fletcher's Cyclopedia of the Law of Private Corporations* §§ 3777, 3796–3834 (1982). Rather, the government cites the concept of corporation by estoppel—the doctrine that when an entity has been held out as a corporation to a third party, neither the entity nor the third party may deny the existence of the corporation in subsequent litigation. See *Cranson v. International Business Machines Corp.*, 234 Md. 477, 200 A.2d 33 (1964); *Fletcher's Cyclopedia* at § 3889.

We seriously doubt whether the doctrine of corporation by estoppel can ever establish a corporation for Fifth Amendment purposes. The estoppel depends on dealings between those holding the entity out as a corporation and the third parties to whom such representations are made. See *Fletcher's Cyclopedia* at § 3898 (the doctrine "cannot apply ... to one who has not dealt with the association, or in any way recognized it as having a corporate existence, or in any way participated in holding it out as a corporation"). For example, creditors who have dealt with an entity as a corporation may be estopped to hold individuals personally liable for its debts. See, e.g., *Cranson v. International Business Machines Corp.*, 234 Md. 477, 200 A.2d 33 (1964). Thus it serves to protect reasonable expectations or reliance. *Cf. Fletcher's Cyclopedia* at § 3907 (noting general requirement of reliance by party asserting estoppel). But it seems improbable that the government as investigator will have engaged in dealings with the "entity" that give rise to the sort of expectations protected by the estoppel. More important, it is hard to see any principled link between the corporation by estoppel and the collective entity doctrine. The latter arises out of a person's having voluntarily assumed duties to act for an entity that does not enjoy the protection of the privilege against self-incrimination. Unless there actually are persons *within the entity* to whom the duties described by *Bellis* can run, it is hard to see why misrepresentations to outsiders can make the doctrine applicable. Here, in any event, there is no claim that appellant or Entity B implicitly or explicitly represented to the government that it was a corporation, so the bare bones of the doctrine are not satisfied.

It is quite true that in *Bellis* the Court noted that the partnership had "in general, held itself out to third parties as an entity with an independent institutional identity." 417 U.S. at 97, 94 S.Ct. at 2187. But we do not read the reference as by any means adopting a doctrine of corporation (or "entity") by estoppel. The "holding out" was certainly an indicium that the persons involved acted as a collective entity, but that

hardly indicates that *one* person's pretense of corporate status, in relations with a bank over one account, could turn that person and a few minions into a corporation or other collective entity.

The government cites a number of cases in support of its proposed use of estoppel, but we believe they establish a good deal less. *In re Two Grand Jury Subpoenae Duces Tecum Dated August 21, 1985,* 793 F.2d 69, 72 (2d Cir.1986), is similar to *Bellis* in that the court mentions, among many other elements, that the entity it finds to be collective had held itself out as a multi-person law firm. Similarly, while the court in *United States v. Theodore,* 479 F.2d 749 (4th Cir.1973), said that a partnership was estopped to deny "the existence and viability of its corporate entity," *id.* at 753, this was simply a response to a claim that its failure to file articles of association prevented it from becoming a valid corporation. (The court assumed that a partnership did not constitute a collective entity.) The opinion does not reveal any other fact that might militate at all against a finding of collective entity. *In re Subpoena Duces Tecum to Gold Depository Unlimited of America,* 436 N.Y.S.2d 794, 106 Misc.2d 992 (N.Y.Sup.Ct.1980), which follows *Theodore* with virtually no discussion, does not indicate how the entity would measure up under the *Bellis* criteria.

Thus the record does not establish a reasonable basis for treating Entity B as a collective entity. In the absence of such a showing (or proof by the government that the possession, existence and authentication of the records is a "foregone conclusion," see *Doe,* 465 U.S. at 614 n. 13, 104 S.Ct. at 1243 n. 13), appellant may invoke his privilege against self-incrimination. We reverse the district court's order compelling appellant to comply with this subpoena and reverse the corresponding portion of its contempt order.

*So ordered.*

MIKVA, Circuit Judge, concurring:

I agree with the decision and thoughtful opinion of my colleagues. I write separately because I am troubled by the effort made by the government (and analyzed by the court) to apply an estoppel doctrine to the question of whether Entity B is a collective entity not entitled to claim the privilege against self-incrimination. My colleagues question "whether the doctrine of corporation by estoppel can ever establish a corporation for Fifth Amendment purposes." At 90. I think that the answer is appropriate, but that the question is not.

I find the government's argument more confusing than illuminating. It is clear that Entity B never held itself out to the government to be a corporation; if the only applicable doctrine is "estoppel" that indeed ends the inquiry. But the government is seeking to vindicate the public interest, rather than any victim of an estoppel. A more appropriate inquiry would be whether an entity taking the benefits of the corporate form expressly or impliedly "waives" the privilege of non-production of documents. Such a doctrine of waiver better fits the fact-situations that arise in this Fifth Amendment thicket. But since the government did not claim such a waiver here, and since the facts seem not to sustain such a holding, the result ordained by my colleagues would be the same.